Decided 23 January, 1906.

**KEYSTONE MILLING CO. *v.* EQUITY MINING CO.**

83 Pac. 190.

From Grant: ROBERT EAKIN, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by the Keystone Mining & Milling Co. and another against the Equity Copper & Gold Mining Co. to enjoin an alleged trespass on real property. The plaintiff the Keystone Mining & Milling Co., a corporation, is the owner of a quartz mining claim in Grant County, known as the "Keystone," and its coplaintiff, the Keystone Mining Co., a corporation, is in possession thereof, pursuant to a contract to purchase the premises. The defendant, the Equity Copper & Gold Mining Co., a corporation, is the owner of quartz mining claims called the "Colorado" and the "Oregon." It is alleged in the complaint that the defendant, pretending to develop its claims, willfully trespassed upon plaintiff's lode, taking therefrom and converting to its own use large quantities of valuable gold-bearing ore, to plaintiffs' damage in the sum of $20,000, thereby de-

stroying the substance of the mine, and to prevent further injury to the property an injunction is prayed. The answer denies the material allegations of the complaint and avers facts tending to show the defendant's title to its claim. The right to extract ore from the tunnels which the defendant has run is asserted by adverse possession and also by estoppel. The reply put in issue the allegations of new matter in the answer, and, the cause having been referred, the court found from the testimony taken that the boundaries of the Colorado claim do not conflict with those of the Keystone; that the southern boundary of the Oregon claim overlaps the northern boundary of the Keystone, not more than 150 feet, but that the defendant had done no work on the Oregon claim within the limits of the Keystone; and that plaintiffs were not entitled to an injunction or to damages. A decree having been rendered according to such findings, but establishing the boundaries of the defendant's claim, the Keystone Mining & Milling Co. appeals. AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. N. C. Richards.*

For respondent there was a brief with oral arguments by *Mr. Errett Hicks* and *Mr. John Langdon Rand.*

MR. JUSTICE MOORE delivered the opinion of the court.

The question to be considered is, where were the boundaries of the Keystone claim originally located ? The transcript shows that in 1881 W. F. Settlemeir located the Wide West quartz mining claim, A. E. Starr the Keystone, and W. B. Carpenter the Green Mountain. These claims, as evidenced by the notices of location, which were duly recorded, were each 1,500 feet in length and 300 feet in width on each side of a lode, and extended in the order named southwesterly, and were treated by the locators, who were partners in the enterprise, as an entity known as the "Key-

stone Mines." The location notices contained separate statements as follows: The Wide West: "Running from the Keystone quartz claim northerly. Location on the hillside on the left-hand side of the Left-Hand Fork of Dixie Creek." The Keystone: "Running from this notice southerly. This location is on the hill on the left-hand side of the Left-Hand Fork of Dixie Creek, running southerly toward what is known as 'Henry Gulch.'" The Green Mountain: "Said claim runs in a southerly direction from the Henry Gulch south of the Keystone quartz ledge." The plaintiffs introduced in evidence maps showing that the group of mines is situated in sections 2 and 11, in township 12 S. of range 33 E. of the Willamette Meridian. There is represented on one of these maps ravines marked "Comer Gulch" and south thereof "Henry Gulch," which are nearly parallel, extending southeasterly and terminating at a stream noted as "Left or South Fork of Dixie Creek"; such creek having been named "left" contrary to geographical rule by looking up stream. While the group of mines was so owned by the partners, Starr, on January 27, 1885, located westerly thereof another quartz mining claim called the "Colorado"; the notice stating that it extended southerly from Comer Gulch. Settlemeir having parted with his estate in the Keystone Mines, his successors in interest and Starr and Carpenter on July 5, 1886, executed to J. Frank Watson a deed to the Keystone, the Wide West, and the Green Mountain claims; the conveyance stating that the Wide West and the Green Mountain claims were northerly and southerly extensions, respectively, of the Keystone. The Keystone Mining & Milling Co. having been incorporated, Watson, on July 12, 1886, executed to it a deed to the mining claims which he purchased. This corporation operated the mines about four years, when it abandoned the Wide West and Green Mountain claims, whereupon the former was attempted to be relocated, June 24, 1891,

by W. W. Jones, C. R. Johnson, and W. B. Woodruff, who placed the southern boundary thereof at Comer Gulch calling the claim the "Little Denver." An amended location of the last named claim was made by the same persons, November 9, 1891, in which the courses and distances from the point of discovery are given; the notice specifying that the claim was situate "on the north side of Comer Gulch, near Main Dixie Creek." Isham Laurence, having secured the title to the Little Denver, relocated that claim, September 9, 1898, calling it the "Oregon." Having secured the estate of A. E. Starr and of others in the Colorado claim, he executed a deed thereof and also of the Oregon claim, November 7, 1902, to the Equity Copper & Gold Mining Co., which commenced running tunnels, expending about $23,000 for labor, when it discovered a valuable deposit of gold-bearing ore. The Keystone Mining & Milling Co., on August 24, 1903, entered into a contract with the Geiser-Hendryx Investment Co., a corporation, whereby it stipulated to sell and convey to the latter the Keystone quartz mining claim for the sum of $20,000, payable in 18 months, giving possession of the premises.

A. Philbrick, a mining engineer, at the request of the Geiser-Hendryx Investment Co. surveyed what he considered to be the Keystone quartz mining claim, placing the north boundary thereof about 150 feet north of Comer Gulch, and on August 22, 1903, Watson, as president of the Keystone Mining & Milling Co., subscribed the latter's name to an amended location notice of that claim, corresponding to Philbrick's survey thereof. Watson thereafter, concluding that such survey was incorrect, employed A. B. Browne, a mining engineer, who surveyed what he considered to be the Keystone claim, placing the north boundary thereof about 800 feet north of Comer Gulch, thereby finding an excess of 228.7 feet on the south end of the claim. The Keystone Mining & Milling Co., on

December 22, 1903, made an amended location of the Keystone claim, according to Browne's survey, and the Geiser-Hendryx Investment Co., on February 9, 1904, located the excess found by Browne, which was called the "Keystone Fraction." The corporation last mentioned assigned all its interest in the contract for the purchase of the mine to the Keystone Mining Co. If the northern boundary of the Keystone claim is the line located by Browne, the west boundary thereof overlaps the northeast corner of the Colorado claim about 200 feet; the southwest corner of the Keystone Fraction claim being about on the line of the Colorado claim. If, however, the northern boundary of the Keystone claim coincides with the line surveyed by Philbrick, and as found by the trial court, though it overlaps the southern boundary of the Oregon claim, the western boundary of the Keystone claim does not interfere with the eastern boundary of the Colorado claim, and, as no work has been done by the defendant on the Oregon claim within the boundaries of the Keystone claim, the plaintiffs have sustained no damage and are not entitled to an injunction. The relocation of the northern boundary of the Keystone claim as originally indicated by the locator is necessarily decisive of the issue involved.

J. Frank Watson, as plaintiff's witness, testified that, when he was negotiating for the purchase of the group of mines, A. E. Starr, one of the locators, pointed out to him what purported to be the boundary common to the Keystone and to the Wide West claims, calling his attention to a stump near an open cut to which a board was nailed, having thereon location notices of such claims, which stump stood about 600 or 700 feet north of Comer Gulch, and saying that the point indicated was at the discovery shaft of the Keystone claim. Watson further testified that at that time he made a topographical sketch of the several claims, which, having been introduced in evi-

dence, has indicated thereon the boundary common to the Wide West and to the Keystone claims located at a winze marked "30 feet deep," which was dug near the summit of a hill; the outline showing a deep depression intended to denote Comer Gulch as being situate about the middle of the Keystone claim. The witnesses Justin Henry, Robert C. Reed, Richard Hall, W. F. Settlemeir, the locator of the Wide West, and W. B. Carpenter, the locator of the Green Mountain claim, severally testified that the location notice of the Keystone claim was posted at the point indicated by Watson. The foregoing is a summary of the testimony given by plaintiffs' witnesses tending to show that the north bouudary of the Keystone claim was located about 800 feet north of Comer Gulch.

Isham Laurance testified that Starr pointed out to him the Keystone claim as lying south of Comer Gulch, and J. W. Mack testified that he saw posted on a tree south of Comer Gulch the Keystone location notice, in speaking of which he said: "That was the first quartz notice I ever saw." A blue print of the several claims, offered in evidence by the defendant has indicated thereon a point denominated "Mack Notice," which, according to scale, is about 175 feet south of Comer Gulch. Samson Roy testified that Starr pointed out to him the northeast corner of the Keystone claim, which was about 270 or 300 feet north of Comer Gulch, and W. E. Gifford testified that he was employed as a miner by Starr, who showed him the north boundary of the Keystone claim, which was evidenced by a stump standing about three or four rods north of such gulch. The testimony last mentioned constitutes all the direct evidence tending to show that the north boundary of the Keystone claim was located near Comer Gulch, and, although the greater number of witnesses place such line about 800 feet north of the gulch, we think the testimony given by defendant's witnesses, when considered in con-

nection with certain facts to be mentioned, preponderates, and that the finding and decree of the trial court on that issue are correct.

The witness J. W. Mack, who is a surveyor, testified that Starr employed him to ascertain the legal subdivisions of public land upon which he had built a house, saying to the witness that, as there was no proper place on the Keystone claim to erect a dwelling, he had built across the gulch and wanted a description of the premises, so he could make a location thereof and save his home. Mack further testified that Starr took him to a quarter post standing just above the mouth of the gulch, and thence to the section corner one-half mile west, and, returning to the quarter post, he found by sighting through to the other point that the house was not on the Keystone claim, whereupon the witness gave Starr a description of the land which he desired. Justin Henry testified that Starr took up a piece of land on Comer Gulch. W. F. Settlemeir testified that he thought it was Starr's intention to take a land claim, so that his house, which had not been moved, might be thereon. Isham Laurance testified that Starr's house was built on vacant ground, and that, when the mining claim was sold to Watson, Starr received $500 more than either of his partners, which sum was paid him for his house. M. Howell also testified that Starr built his house individually, and that he was paid $500 for the dwelling. A. B. Browne, who surveyed the Keystone claim for plaintiffs, testified that his attention was called to a building on the north side of Comer Gulch, which was pointed out to him as Starr's house. One of the maps which this witness prepared, and which was received in evidence, has delineated thereon a square marked "Starr House." Measuring from the west line of such square west to the boundary of the Keystone claim as located by Browne, according to the scale of his map, the distance is about 60 feet.

That Starr's house was built west of the side line of the Keystone claim, as originally located, has been established, we think, beyond a doubt. As Browne's survey places this building within the limits of the Keystone claim, it is evident that the western boundary thereof has been "floated" to the west since it was originally located. This result was secured by adopting the stump identified by plaintiff's witnesses as the north center end of the Keystone claim, the west boundary of which is not parallel with the east boundary of the Colorado claim.

The Wide West and the Green Mountain claims were intended by the original locators thereof to be the northerly and southerly extensions, respectively, of the Keystone claim. An examination of the location notice of the Green Mountain claim will show that it contains the following statement: "Said claim runs in a southerly direction from Henry Gulch and south of the Keystone quartz ledge." Henry Gulch is about 2,200 feet south of Comer Gulch, as indicated by the scale adopted by Browne in making his map. Construing the notice of the Green Mountain claim according to the fair import of the words used in the clause quoted, we think there can be no doubt that it was the intention of the locator of that claim to make Henry Gulch the northern boundary thereof. The distance from Comer Gulch to Henry Gulch being about 2,200 feet seems to substantiate J. W. Mack's testimony as to his having seen the location notice of the Keystone claim so far south of Comer Gulch, and to corroborate the testimony of Isham Laurance to the effect that, when Starr showed him the Keystone mine, he took this witness south of that ravine. The distance mentioned would also seem to explain the description in the location notice of the Green Mountain claim on the assumption that the Keystone claim extended to Henry Gulch, though the notice of the latter claim is only as follows: "This location is on the hill on the Left-Hand Fork

of Dixie Creek, running southerly toward what is known as 'Henry Gulch.'" The short space intervening between these gulches would further appear to elucidate the description last given, by assuming that, if the north boundary of the Keystone claim was on the line indicated by the stump referred to as the initial point, Starr's notice of location would probably have stated that his claim extended across Comer Gulch; the testimony disclosing that such ravine is deeper, but not so broad, as Henry Gulch.

W. F. Settlemeir, the locator of the Wide West claim, after an absence of about 20 years, visited the territory originally included in that claim, in company with F. D. Stanley, Samson Roy, D. R. Roberts, and W. J. Hughes, who severally testified that he took them to a stump near an open cut north of Comer Gulch, and said that the Wide West claim originally extended north and south from that point about 700 and 800 feet, respectively; that Settlemeir further said that his son-in-law, W. J. Galbreath, located a claim as a northern extension of the Wide West claim, but, not having made any discovery of valuable mineral ore therein, he dug a hole in his claim and put therein some quartz which he took from the Wide West claim; that Settlemeir, going about 700 feet north from such open cut, came to a hole partially filled, and Roberts, digging therein, found some quartz which Settlemeir said had been brought from the Wide West claim. Two of the witnesses say that, measuring from such hole, it was found to be 60 feet south of the north boundary of the Oregon claim. Settlemeir admits making the statements so imputed to him, but, explaining them, he testified that, after showing such witnesses what he supposed to be the boundaries of the Wide West claim, he was informed by his son-in-law, and also by W. B. Carpenter, that the open cut to which he went was in the Keystone claim, and that, his memory having been refreshed by such information, he was satisfied that

he erred in what he at first considered to be the bound-aries of the Wide West claim.  Settlemeir further testified that he came to the hole referred to sooner than he ex-pected to find it.  W. J. Galbreath testified that, going about 1,500 feet north of the open cut, he dug a hole about 20 inches deep, and, not discovering any ore, Starr thereafter informed him that he had taken some quartz and put it into such hole, so that the witness could make a location when he had time to find the ledge.

Mr. Settlemeir is 70 years old, and he had not been at the Keystone claim for about 20 years, until he visited it just prior to the trial herein, in company with the officers, agents, and employees of the defendant company.  His age and the time that had elapsed since he saw the property explains, in our opinion, why he so readily acquiesced in the suggestion of others in respect to the boundaries of the Keystone claim.  We do not doubt the sincerity of his ulti-mate belief in respect to the issue involved, for an exam-ination of his testimony clearly shows a desire to tell the whole truth ; but we nevertheless believe that the discovery of the quartz in the hole which he claimed his son-in-law dug, conclusively shows that his prior opinion as to the north boundary of the Wide West claim was correct.  That A. E. Starr, the locator of the Keystone claim, showed Wat-son a stump near a winze, which he claimed was on the boundary common to that claim and to the Wide West, there can be no doubt, as is evidenced by the topographical sketch made by Watson at the time he purchased the prop-erty.  It will be remembered that Starr pointed out to vari-ous persons, who appeared as witnesses at the trial, dif-ferent points as corners and north center ends of the Keystone claim.  The variant points so indicated by him cannot all be correct, and, this being so, we think the loca-tion notice of the Green Mountain claim, fixing the north boundary thereof at Henry Gulch ; the building of Starr's

house off the Keystone claim as originally located; and the discovery of the quartz in the hole pointed out by Settlemeir—give preponderance to the testimony produced by the defendant and irresistibly lead to the conclusion that the Keystone claim did not originally extend so far north as Starr claimed to Watson and to others who appeared as plaintiff's witnesses.

In our opinion the testimony of J. W. Mack, to the effect that he saw the location notice of the Keystone claim posted on a tree standing south of Comer Gulch is entitled to credit, because he says such notice was the first he had ever seen of a quartz mining claim. Such notice, being the first of its kind Mack had ever seen, would in all probability attract his attention, and thus impress upon his memory, not only the form thereof, but the particular place of its location as well. This notice is attempted to be explained by several of plaintiffs' witnesses, who testify that an old water right notice was posted in Comer Gulch. We do not think the explanation contradicts Mack's statement, for the point to which he referred is several feet south of the gulch, where the testimony shows the surface of the ground to be very precipitous, in which place it would seem unreasonable to think that a water right notice would be posted, but rather in the ravine, as testified to by some of plaintiffs' witnesses, thus showing that more than one notice was posted in that vicinity.

We believe that a fair consideration of all the testimony introduced at the trial, when construed in connection with the circumstances adverted to, fairly shows that the north boundary of the Keystone claim never originally extended north of Comer Gulch; but, the trial court having established such boundary on a line about 150 feet north thereof, and no complaint having been made by the defendant, we conclude to leave the boundary as thus determined. The boundaries of the Colorado claim, in which the mining

complained of has been done by the defendant, are hereby established as surveyed by F. D. Stanley, to wit: Beginning at the stake at the southwest corner of the claim, from which the northwest corner of section 11 in township 12 south of range 33 east bears north 87 deg. 1 min. west 1,521.59 feet; thence north 39 deg. 11 min. east 1,475.09 feet, to a stake; thence south 60 deg. 10 min. west 1,500 feet to a stake; and thence westerly to the place of beginning.

It follows, from these conditions, that the decree of the court below is affirmed.          ARRIRMED.